UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| JOHN F. MILLER III, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:09-CV-242 |
| | ) | |
| UP IN SMOKE, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

### I. INTRODUCTION

This matter is before the Court on Plaintiff[1] John Miller's Motion to Appoint a Receiver. (Docket # 62.) Miller, a 50% shareholder of Defendants Up In Smoke, Inc. ("Up In Smoke"), and CR Smoke, Inc. ("CR Smoke"), is asking for the appointment of a Full Receiver over both Up In Smoke and CR Smoke, as well as Fats Enterprises, LLC ("Fats"). Although the parties previously agreed to the appointment of a Limited Receiver over those entities, and one was installed on June 24, 2010 (*see* Stipulated Order Appointing Limited Receiver, Docket # 79), the appointment of a Full Receiver is opposed by Defendant Charlotte Rodriguez ("Charlotte"), the other 50% shareholder of Up In Smoke, and Rudy Rodriguez ("Rudy"), the other 50% shareholder of CR Smoke and the owner of Fats.[2]

For the reasons provided, the Motion to Appoint a Receiver is GRANTED IN PART and

---

[1] As will be discussed more fully in the next section, this case has been recast, in part, as a shareholder derivative action with Miller advancing claims on behalf of Up In Smoke and CR Smoke. While Up In Smoke and CR Smoke remain as defendants for purposes of diversity jurisdiction, they are the nominal plaintiffs for any shareholder derivative claims.

[2] The Limited Receiver has only limited powers and duties, as defined in the Stipulated Order, and primarily serves as an overseer of Up In Smoke's business activities. A Full Receiver, on the other hand, would have far more control; indeed, a Full Receiver would have complete authority over the corporation, including its business activities and operations.

by separate Order, attorney Martin E. Seifert will be appointed as a Full Receiver over Up In Smoke. The Motion will, however, be DENIED concerning the appointment of any receivership over CR Smoke and Fats, and thus the appointment of a Limited Receiver over all three entities (Up In Smoke, CR Smoke, and Fats) will be terminated by this Order.

## II. FACTUAL AND PROCEDURAL HISTORY

Miller and Charlotte formed Up In Smoke in 1997 for the purpose of operating a retail tobacco, alcohol, and fireworks outlet in Fremont, Indiana.[3] Miller and Charlotte each have a 50% interest in Up In Smoke. Miller was initially the president of Up in Smoke, but resigned in 2008. Charlotte is an officer of Up In Smoke and, along with her husband Rudy, is responsible for its day-to-day operation.[4] Although Miller was initially provided with a yearly salary from Up In Smoke, eventually Charlotte and Rudy ceased paying him. Miller and Rudy are equal shareholders in CR Smoke, a corporation they formed in 1998 as a retail outlet in Howe, Indiana, for the sale of tobacco and fireworks.

Over the next decade, Miller's relationship with Charlotte and Rudy gradually deteriorated. Miller claims that by 2005 he was "frozen out" of both Up In Smoke and CR Smoke, when Charlotte and Rudy allegedly stopped his salary and began diverting corporate assets to their own benefit. (Am. Compl. ¶¶ 29-31, 48-52.) The falling-out ultimately culminated in Miller filing this lawsuit in his own name against Up In Smoke, CR Smoke, Fats, Charlotte, Rudy, and Estep Accounting (Up In Smoke and CR Smoke's accounting firm) on August 25,

---

[3] Rudy was not made a shareholder in Up In Smoke because he has a prior felony conviction and his ownership interest would have imperiled the corporation's alcohol sales license. Miller's former wife was also a shareholder but her shares were ultimately transferred to Miller.

[4] In her testimony, Charlotte identified herself as Up In Smoke's Secretary and Treasurer. (Tr. II 75.) She has also apparently been serving as its acting-president since Miller's resignation in 2008. (*See e.g.*, Ex. 66.)

2

2009. (Docket # 1.)

Count I alleges that Rudy and Charlotte misappropriated the corporate opportunities of Up In Smoke and CR Smoke; Count II alleges that Rudy and Charlotte violated their fiduciary obligations to Up In Smoke, CR Smoke, and Miller, individually; and Count III alleges that Rudy and Charlotte converted assets belonging to Up In Smoke and CR Smoke. (Am. Compl. ¶¶ 75-91.) Furthermore, Count IV seeks an equitable accounting and the creation of a constructive trust over the assets of Up In Smoke and CR Smoke; Count V alleges a breach of fiduciary duty against Estep Accounting; and Count VI alleges that the Defendants (presumably all of them) conspired to misappropriate the assets of Up In Smoke and CR Smoke. In Count VII, Miller claims that he is entitled to inspect Up In Smoke and CR Smoke's corporate records pursuant to Indiana Code § 23-1-52-2; in Count VIII, Miller asks the Court to appoint a receiver over the Defendant corporations; in Count IX, Miller asks that, in the alternative, Up In Smoke and CR Smoke be judicially dissolved; and Count X seeks an award of punitive damages and attorney fees. Finally, in Count XI, Miller Fireworks, a separate firework company owned and operated by Miller, claims that Rudy and Charlotte breached a firework sales agreement and owe $29,933.99 on an account.

On June 2, 2010, Miller filed a Motion to Appoint a Receiver over Up In Smoke, CR Smoke, and Fats. On June 24, 2010, the parties agreed to the appointment of David Danic ("Danic"), a C.P.A., as a Limited Receiver to oversee the management and operation of Up In Smoke, CR Smoke, and Fats. (Docket # 79.) The Court instructed the parties to attempt to reach an agreement on the appointment of a Full Receiver and to attend a mediation session in an effort to settle the case, and set the receivership Motion for an evidentiary hearing on July 27, 2010.

(Docket # 79.)

Although Danic did oversee sales during the Fourth of July fireworks season, the parties were unable to reach an agreement concerning the appointment of a Full Receiver.[5] Accordingly, the Court conducted a day-long receivership hearing on July 27, 2010. (Docket ## 90, 138.) During the hearing, the Court questioned whether some of Miller's claims were actually shareholder derivative actions on behalf of Up In Smoke and CR Smoke and continued the receivership hearing until that issue was briefed and decided. (*See* Docket ## 98-101, 106-8.)

On September 8, 2010, the Court issued an Opinion and Order holding that Counts I, II, III, IV, V, and VI of the complaint must be brought derivatively by Miller on behalf of Up In Smoke and CR Smoke. *See Miller v. Up In Smoke, Inc.*, — F. Supp. 2d —, No. 1:09-cv-242, 2010 WL 3613900 (N.D. Ind. Sept. 8, 2010). At the same time, however, the Court determined that because the corporate management of Up In Smoke and CR Smoke (i.e., Charlotte and Rudy) were antagonistic to the claims, the corporations would not be re-aligned as plaintiffs, thus preserving diversity jurisdiction. *Miller*, 2010 WL 3613900, at *6. The Court also determined that Miller could bring Counts VII, VIII, and IX directly in his own name and that, because they did not place more than $75,000 in controversy, the Court would exercise supplemental jurisdiction over them. *Miller*, 2010 WL 3613900, at *7-8.

Therefore, with the case partially re-cast as a shareholder derivative action, the Court resumed the receivership hearing on September 29, 2010. (Docket # 127.) At the conclusion of

---

[5] Although the parties agreed to appoint Danic as a Limited Receiver over both CR Smoke and Fats, those businesses are not in operation and have had no business activity.

that hearing, the Court ordered a transcript and called for briefing, which is now complete.[6]

### III. STANDARD

Federal courts have the inherent equitable power to appoint a receiver during the pendency of litigation. *JPMorgan Chase Bank, N.A. v. Heritage Nursing Care, Inc*., No. 06 C 4803, 2007 WL 2608827, at *8-9 (N.D. Ill. Sept. 6, 2007) (citing *In re McGaughey*, 24 F.3d 904, 907 (7th Cir. 1994)). Additionally, Federal Rule of Civil Procedure 66 specifically allows the appointment of a receiver, although doing so is "an extraordinary remedy and the court should exercise its discretion to appoint one with 'care and caution.'" *Id. (quoting Connolly v. Gishwiller,* 162 F.2d 428, 435 (7th Cir. 1947)). In cases based on diversity jurisdiction, the appointment of a receiver is governed by federal procedural law. *Id.* (citing *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc*., 999 F.2d 314, 316 (8th Cir. 1993); 12 FED. PRAC. & PROC. CIV. § 2983 (2d ed.)). *See also Canada Life Assur. Co. v. LaPeter*, 563 F.3d 837, 843 n.12 (9th Cir. 2009); *Nat'l P'ship Inv. Corp. v. Nat'l Hous. Dev. Corp*., 153 F.3d 1289, 1291-92 (11th Cir. 1998); Fed. R. Civ. P. 66 ("These rules govern an action in which the appointment of a receiver is sought. . . .").

The party seeking the appointment of a receiver bears the burden of showing that the receivership is warranted. *JP Morgan Chase Bank*, 2007 WL 2608827, at *8. Furthermore, the party requesting the appointment must "show that he . . . has some legally recognized right in that property that amounts to more than a mere claim against defendant." *Id*. (quoting 12 FED. PRAC. & PROC. CIV. § 2983 at 20; 65 AM. JUR. 2d *Receivers* § 10). Although there is no precise formula for determining whether to appoint a receiver, the federal courts generally consider the

---

[6] Citations to the transcript of the July 27, 2010, hearing (Docket # 138) are given as "Tr. __", and citations to the September 29, 2010, hearing transcript (Docket # 139) are given as "Tr. II __".

following factors in deciding whether the appointment is justified:

    1. Any fraudulent conduct on the part of the defendant;

    2. The imminent danger of the property being lost, concealed, injured, diminished in value, or squandered;

    3. The inadequacy of the available legal remedies;

    4. The probability that the harm to the plaintiff by the denial of the appointment would be greater than the injury to the parties opposing appointment; and

    5. The plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property.

*JP Morgan Chase Bank*, 2007 WL 2608827 at *9 (citing 12 FED. PRAC. & PROC. CIV. § 2983 at 24-29; *Consol. Rail Corp. v. Fore River Ry. Co.*, 861 F.2d 322, 326-27 (1st Cir. 1988); *Aviation Supply*, 999 F.2d at 316-17)). *See also Solis v. Matheson*, 563 F.3d 425, 438 (9th Cir. 2009) (vacating the district court's appointment of a receiver for failing, in part, to adequately discuss the federal factors).

    In sum, a "'prima facie showing of fraud and mismanagement is enough to call into play the equitable powers of the court' to appoint a receiver." *Tcherepnin v. Kelly*, 416 F.2d 594, 596 (7th Cir. 1969) (quoting *Sec. & Exch. Comm. v. Keller Corp.*, 323 F.2d 397, 403 (7th Cir. 1963)). *See also Phillippi v. Jim Phillippi, Inc.*, No. 2:07-cv-916, 2009 WL 1394830, at *2 (S.D. Ohio May 18, 2009) (discussing need for a receiver where "funds or properties are being mismanaged and are in imminent danger of being lost to the stockholders and creditors through the collusion and fraud of [the corporate] officers. . . ."); *Sec. & Exch. Comm. v. Universal Express, Inc.*, No. 04 Civ. 2322, 2007 WL 2469452, at *3 (S.D.N.Y. Aug. 31, 2007) (noting that

court may appoint a receiver "when necessary to prevent a diversion or waste of assets. . . .").

## IV. FINDINGS OF FACT[7]

Overall, the following recitation demonstrates that after Charlotte installed Rudy as the co-manager of Up In Smoke (Tr. II 244), she abdicated her fiduciary responsibilities as a corporate officer (Tr. II 79, 87, 140, 150), resulting in, over time, the two of them eventually treating Up In Smoke as essentially a private family checkbook. Furthermore, because CR Smoke is a defunct and insolvent corporate enterprise, with outstanding tax liabilities and debts greatly exceeding its assets, it would create economic waste to appoint a receiver over that entity. These propositions are supported by the following facts:

1. From the start, Charlotte and Rudy have maintained an inadequate accounting system (Tr. 24) for Up In Smoke, a business with $3,000,000 in annual gross sales (Tr. 149), $700,000 of which is, at a minimum, in cash transactions. (Tr. II 263.)

2. They have also failed (at least prior to the appointment of Danic) to maintain any meaningful fireworks inventory system (Tr. 38, 138-39) and still have no way to match firework sales to existing inventory, or to track such cash purchases. (Tr. 39.) Accordingly, cash sales of fireworks can occur "off the books" since there is no point-of-sale ("P.O.S.") inventory tracking system and no way to accurately ascertain the volume of sales that have occurred.

3. As a result of the high level of cash transactions (both flowing in as sales and going out as payments to suppliers, creditors, and others), a primitive internal method of accounting, the lack of an accurate list of either payables or accounts receivable, the payment of wages to employees exclusively in cash (Tr. II 116), and the absence of a P.O.S. system with

---

[7] The following findings of fact are based on a preponderance of the evidence. To the extent a finding of fact is actually a conclusion of law, it is incorporated into Section V, *infra*, by this reference.

accompanying inventory control, Charlotte and Rudy have operated in a culture where there are virtually no checks or balances concerning their activities and no reliable records of their financial dealings. For example, the lack of an inventory system has allowed Rudy to inflate and deflate inventory figures at will (Tr. II 241), resulting, on at least one occasion, in increased inventory tax obligations to Up In Smoke (Tr. II 264-65) and an overall reliance on mere "rough estimates." (Tr. II 279.)

    4. Charlotte has also permitted Rudy to operate unrelated businesses on Up In Smoke property and to occupy Up In Smoke buildings without paying rent. For example, Charlotte has permitted Rudy to operate a car business, trucking company, and an unrelated fireworks business on the premises, all rent-free, thus denying the corporation that income or business opportunity. (Tr. 102, 228; Tr. II 29-33.) Charlotte explains these accommodations as additional compensation to Rudy for providing security services and repairs (Tr. 228), but this ignores the large salary she was already paying Rudy from Up In Smoke, as well as the unrestricted and unsecured loans he obtained from the corporation (seemingly at will), without corporate or legal formality, and apparently without interest or debt-service obligations. Ultimately, Charlotte excuses the free rent to Rudy (and the corresponding lost rental income to Up In Smoke) as merely another way to supplement their already generous corporate incomes. (Tr. II 33.)

    5. To the extent Charlotte has maintained an accounting system, it lacks any internal controls. For example, Charlotte once paid $40,000 to Rudy's "office manager" and now has no explanation concerning the purpose for the payment or any recall concerning the services the officer manager may have provided to Up In Smoke. (Tr. 159-62.) In actuality, it appears that Rudy routinely benefitted beyond free rental space, as other items of overhead for his side

8

businesses were often paid for or underwritten by Up In Smoke without apparent repayment or any return on investment.

6. While Up In Smoke was being denied such income opportunities, and as large and unexplained expenditures were being made by Charlotte (often for and on behalf of Rudy), the corporation was forced to pay delinquent penalties on its real estate taxes (Tr. 44, 96-97) and had Indiana sales tax warrants issued against it. (Tr. 95; Ex. 4.)

7. The deficient accounting system has also led to an apparent inability on the part of the Limited Receiver to accurately determine (or at least reconcile) Up In Smoke's current account payables. (Tr. II 63.)

8. Moreover, Up In Smoke has a $160,000 judgment against it by Elkhart Wholesale (Tr. 53), but part of the judgment stems from Charlotte writing bad checks. (Tr. 125-27.) Other creditors have lodged claims against Up In Smoke, but because Charlotte routinely used Up In Smoke accounts to purchase fireworks inventory for Rudy's separate fireworks retail businesses (e.g., Fats and Big Shot), she has exposed the corporation to collection efforts and judgment liens upon Rudy's default.[8] (Tr. 57-58; 246.) In one instance, Charlotte's practice of essentially floor-planning Rudy's inventory led to a lawsuit and judgment against Up In Smoke by Fireworks Over America ("FOA") when Rudy failed to pay the obligation.[9] (Tr. 123; Tr. II 10.) Unfortunately, Up In Smoke's reported cash flow has been inadequate to allow it to liquidate these judgments. (Tr. 202.) Consequently, the corporation is exposed to collection efforts that

---

[8] Up In Smoke routinely buys fireworks for Rudy at wholesale but without the usual 35% markup (Tr. 116-18)—yet another instance of underwriting Rudy's overhead and another lost corporate opportunity.

[9] Compounding the problem, Charlotte has not told the corporate accountant or Danic of the FOA judgment because, she says, it belongs to Rudy. (Tr. 123-24.)

9

threaten its operation and has had to secure the services of an attorney to assist in negotiating payments. (Tr. 126-27.)

9. Charlotte and Rudy are also not paying Up In Smoke's obligations to Miller Fireworks—again, another example of the co-mingling of Up In Smoke and Rudy's purchases (Tr. 122)—because of a dispute with Miller over their corporate salaries. (Tr. 202; 246.) Thus, Rudy and Charlotte are using an account payable of the corporation as a means of extracting concessions concerning their personal salaries.

10. The concern over Charlotte and Rudy's compensation is understandable given that prior to the installment of the Limited Receiver and his intervention, Charlotte was, at times, paying both herself and Rudy $83,000 per year (Tr. 101), a very high level of compensation for a business in this industry. (Tr. II 122.) The level of compensation for Rudy is particularly high since he appears to do little for Up In Smoke other than negotiate an occasional cigarette contract and help with sales. Moreover, Rudy and "Little Rudy" (Charlotte and Rudy's son) seem to use Up In Smoke employees for their own ventures (Tr. 180), a practice easily facilitated since Charlotte does not rigorously keep track of employee hours. (Tr. 180.) Finally, because Charlotte has no meaningful inventory system other than a loose tally method, Up In Smoke inventory is sometimes simply taken by Rudy for his own fireworks sales (Tr. 141), with no clear assurance or evidence that those items are ultimately replaced.

11. In addition to his high level of compensation, unlimited borrowing, and free rent, Rudy was also provided unlimited and free use of five or more Up In Smoke storage units (Tr. 134-36, 229; Tr. II 13) to stow car parts or the firework inventory of Fats or Big Shot. This accommodation was ostensibly viewed by Charlotte as simply more payment for Rudy's services

and resulted in an extremely high level of compensation to Rudy, plus additional lost revenue to Up In Smoke.

12. Rudy has also been permitted to take loans from Up In Smoke (apparently owing at one point more than $100,000) (Tr. 151-52) for personal living expenses. There still is a balance owed by Rudy to Up In Smoke (Tr. II 258) and there is no indication that any interest has ever been charged or paid on this debt. "Little Rudy" has also been granted loans but the corporate accounting is so muddled that it is difficult to determine what Rudy or "Little Rudy" truly owe. (Tr. II 108-10; 258-59.)

13. In addition, Rudy apparently leased (for an undisclosed sum) a parcel of Up In Smoke's real estate to "Little Rudy" to start an auto sales business together with an easement for the construction of a driveway. (Tr. 244.) When the parcel (as part of a larger tract of land) was subsequently sold by Up In Smoke, Rudy and Charlotte apparently used $30,000 of the corporation's proceeds to "buy out" Little Rudy's leasehold interest, including what he had expended on improving the easement and building materials. (Tr. 163-64; 244.) There appears to have been no consultation with Miller, the other 50% shareholder, concerning extending a lease to "Little Rudy" or buying it back, as no corporate formalities were observed and no appraisal or accounting occurred.

14. Rudy also started what Charlotte describes as a "subsidiary" of Up In Smoke (Tr. 130)—the Smokin' Store in Angola, Indiana. Although Up In Smoke paid for at least part of the "subsidiary's" purchase price, and it is an acknowledged corporate asset, Rudy had the real estate titled in his name alone. (Tr. 131, 160, 224-25.) Rudy and Charlotte apparently lost interest in the Smokin' Store; this corporate asset has been allowed to decline and go into waste,

11

and Rudy has allowed the real estate taxes to become delinquent. (Tr. 131-32, 227.) Moreover, although the land has been planted in hay, no crop rental (or rental income from the commercial billboards on the real estate) has ever been paid over to Up In Smoke. (Tr. 132-33; 225-26.) Although the Smokin' Store is an asset of Up In Smoke, Charlotte considers it to be Rudy's business and is seemingly unaware of its income, income potential, or the obligations it owes. (Tr. 133.)

15. Overall, the Rodriguez family has treated Up In Smoke as their personal checkbook (Tr. II 128, 244), observing no corporate formalities, and amassing an unusual and unexplained level of bad debt ($61,303) (Tr. II 114) for what is largely a cash-based retail business. Moreover, because of the crude accounting methods, loose cash controls, inadequate inventory system, the seemingly unrestrained and virtually undocumented invasion of the corporate treasury through loans to Rudy and "Little Rudy", and the lack of a definitive or accurate balance sheet or list of payables, the true value or net worth of Up In Smoke cannot be determined. (Tr. II 129.) In addition, the two equal shareholders are at loggerheads and deadlocked, cannot accurately or with confidence "buy-out" the other, and, at present, are joint owners of a business that maintains an inadequate cash flow to pay or service current obligations. (Tr. II 79.)

16. CR Smoke (owned by Miller and Rudy in equal 50% shares) was administratively dissolved by the Indiana Secretary of State on December 4, 2003. The parties do not dispute that CR Smoke is no longer in business, has no assets, and owes potentially over $600,000 in unpaid taxes and other liabilities. (Tr. II 125-27.)

# V. CONCLUSIONS OF LAW[10]

*A. A Full Receiver Will Be Appointed Over Up In Smoke*

The evidence and testimony demonstrate that continued management by Charlotte and Rudy will likely lead to Up In Smoke's property being lost, concealed, or diminished in value such that existing legal remedies are inadequate to protect the corporation from further harm. *Phillippi*, 2009 WL 1394830, at *2; *JP Morgan Chase Bank*, 2007 WL 2608827, at *9. Further, the possible harm caused by the appointment of a Full Receiver is less than the harm that will be suffered by Up In Smoke if a Full Receivership is not imposed. *Canada Life Assur. Co*, 563 F.3d at 845-6. Finally, the shareholder derivative action has a likelihood of prevailing at trial and, absent the appointment of a Full Receiver, there is a serious possibility that the interests of Up In Smoke will suffer irreparable injury. *JP Morgan Chase Bank*, 2007 WL 2608827 at *10.

As previously discussed, Up In Smoke does approximately $3,000,000 in gross sales (Tr. 149), $700,000 of which is in cash. (Tr. II 263.) However, the business does not have effective accounting procedures and, as Danic testified during the July 27, 2010, hearing, there is no P.O.S. system or related inventory controls to prevent "off the books" cash sales. (Tr. 38-39.) *See JP Morgan Chase Bank*, 2007 WL 2608827, at *9 (recognizing that "poor record-keeping" increases the risk of property being lost, diminished in value, or squandered). Furthermore, the lack of effective accounting procedures and inventory controls means that, unless some stringent measures are taken, Up In Smoke's inventory will continue to be co-mingled with that of the Rodriguez family's other fireworks businesses. Additionally, the Smokin' Store in Angola, Indiana, has been allowed to be placed in Rudy's name and go into waste, despite its income

---

[10] To the extent a conclusion of law is actually a finding of fact, it is incorporated into Section IV, *supra*, by this reference.

potential. (Tr. 132-33; 225-26.)

Although Up In Smoke has been operating under a Limited Receivership since June 24, 2010 (Docket # 79), there remain serious underlying, fundamental problems with its management and operation—something the Limited Receiver has little power to address—further necessitating the appointment of a Full Receiver. For example, during the July 27, 2010, hearing, Danic testified that Up In Smoke continues to use an antiquated and unsophisticated accounting system, such that accounts payable are difficult to track. (Tr. 24-26.) During the September 29, 2010, hearing, Danic again testified that because of Up In Smoke's deficient accounting practices, he was still uncertain of the total accounts payable. (Tr. II 63-64.) Danic also testified that no plan has been implemented, or even devised, to pay past-due bills and that even after three months of a Limited Receivership, Up In Smoke does not have sufficient cash on hand to pay, on a going-forward basis, judgments and other accounts payable. (Tr. II 64.) One of the fundamental problems is that the Stipulated Order retains Charlotte as manager and essentially installs Danic as something of an overseer of the business and a mediator between Miller and the Rodriguezes. (Docket # 79, ¶ 2.) Stated another way, Danic is not empowered to take possession of Up In Smoke's property and assets and to independently manage the corporation.[11] Therefore, the continuation of the Limited Receivership is an insufficient solution. *See Dixon v. Barry*, 967 F. Supp. 535, 554 (D.D.C. 1997) (finding a full receivership to be the only remedy after numerous other court-appointed overseers proved

---

[11] The over-arching structural problem that Danic could not resolve, and Charlotte refuses to acknowledge, is the continual use of the corporation and the corporate assets as essentially a family checkbook. It appears that Rudy uses Up In Smoke as a vehicle to facilitate and fund his own business pursuits with virtually no recognition that he is not a shareholder or that Miller and Charlotte have equal shares. In short, there is little likelihood that Charlotte will compel any fundamental change over the conduct of Rudy or Little Rudy given the culture that has grown up around Up In Smoke.

14

ineffective); *Cf. ABM Janitorial Serv. N. Cent., Inc. v. PAMI Ryan Town Ctr.*, No. 08-cv-100, 2008 WL 4809659, at *3 (N.D. Iowa Oct. 31, 2008) (declining to appoint receiver because disputed property was already being managed by capable third-party).

Additionally, the possible harm caused by the appointment of a Full Receiver is less than the harm that would be suffered if a Full Receiver is not imposed. Although appointing a receiver is a drastic and expensive remedy, the evidence establishes that such an appointment is necessary if the corporation is to survive and eventually thrive.

As Danic testified during the July 27, 2010, hearing, Up In Smoke has amassed at least $290,000 in outstanding debts to two inventory suppliers. (Tr. 24-6.) The evidence shows that while Up In Smoke likely has a positive net worth (primarily through the equity it has established in the real estate it is purchasing on a land contract), it does not have sufficient cash flow or liquid assets to meet these obligations and current operating expenses. (Tr. II 64.) *See Canada Life Assur. Co*, 563 F.3d at 845 (upholding the appointment of a receiver based, in part, on income being diverted and inability to discharge debts). The inability to pay its obligations threatens Up In Smoke with more creditor litigation and will likely endanger relationships with inventory suppliers as well as undermine its ability to reconstitute itself as a successful business.

Finally, the shareholder derivative action has a likelihood of prevailing at trial and, absent the appointment of a Full Receiver, the interests of Up In Smoke will likely suffer irreparable injury. The evidence indicates that Charlotte has ignored her fiduciary duties to Up In Smoke by allowing the Rodriguez family to treat Up In Smoke as its personal checkbook, abandoning corporate formalities, amassing a high level of debt, and engaging in extensive self-dealing through exorbitant salaries and unrestricted, unsecured, and, apparently, non-interest

bearing loans to non-shareholders such as Rudy and "Little" Rudy. (Tr. II 128-29, 244.) Absent the appointment of a Full Receiver, it is likely this activity will continue with Up In Smoke suffering irreparable injury.

The Defendants dispute, of course, the need for a Full Receiver by frequently arguing that Miller knew about, but never objected to, the alleged mismanagement. This argument ignores, however, that this lawsuit has been partially recast as a shareholder derivative action with Miller acting merely as the representative of Up In Smoke. Thus, Up In Smoke is the real party in interest seeking the appointment of a Full Receiver. *See Miller*, 2010 WL 3613900, at *4 (citing *Barth v. Barth*, 659 N.E.2d 559, 560 (Ind. 1995); *Knauf Fiber Glass, GMBh v. Stein*, 622 N.E.2d 163, 165 (Ind. 1993); *Moll v. S. Cent. Solar Syst., Inc*., 419 N.E.2d 154, 161 (Ind. 1981)). Accordingly, for the most part, the assertion that Miller tacitly approved or ignored the alleged mismanagement of Up In Smoke is no bar to the appointment of a receiver.[12]

To summarize, the imminent danger of Up In Smoke's property being lost, concealed, squandered, or diminished in value supports the appointment of a receiver. *See JP Morgan Chase Bank*, 2007 WL 2608827, at *9. The continued appointment of the Limited Receiver has proven inadequate to remedy the inherent problems with Charlotte's management or to protect the interests of Up In Smoke. Given the problems facing Up In Smoke, the harm caused by the appointment of the Full Receiver is outweighed by the harm the company will suffer if such a receivership is not created. Finally, because the shareholder derivative action has a likelihood of prevailing at trial, Up In Smoke will suffer irreparable injury if a Full Receiver is not appointed.

---

[12] To the extent that the evidence reveals that Miller failed to discharge his responsibilities to Up In Smoke, or worse, used corporate assets without authorization to advance his personal fortune, it illustrates that he is also a poor candidate to be put in charge. Of course, to the extent that the corporation has a cause of action against Miller for allegedly pledging corporate assets without authority, and benefitting thereby, that claim now belongs to the Full Receiver to pursue and the corporation's Motion to Amend (Docket # 123) thus remains under advisement.

Accordingly, the Motion to Appoint a Receiver is GRANTED with respect to Up In Smoke, and a Full Receiver will be appointed by separate Order.

*B. A Full Receiver Will Not Be Appointed Over CR Smoke and Fats*

In his Motion, Miller maintains his request that a Full Receiver also be appointed over CR Smoke, notwithstanding the parties' apparent agreement that CR Smoke is defunct, has no assets, and massive debts. Appointing a Full Receiver to take charge of CR Smoke—which would unquestionably be an expensive undertaking— would appear on this record to be a futile exercise and an economic waste. *See Mintzer v. Arthur L. Wright & Co.*, 263 F.2d 823, 826 (3d Cir. 1959) ("A receiver will not be appointed where it will do no good."). Accordingly, the Motion to Appoint a Receiver over CR Smoke is DENIED WITHOUT PREJUDICE, although Miller, as the representative of CR Smoke's shareholder derivative claims, may later renew his request if it is warranted by the then-existing record.

Similarly, the Motion to Appoint a Receiver over Fats is DENIED. Neither Miller, Up In Smoke, nor CR Smoke have any ownership interest in Fats (which also appears to be defunct), and therefore they do not have standing to seek or obtain appointment of a receiver over that entity. *See JP Morgan Chase Bank*, 2007 WL 2608827, at *8 (quoting 12 FED. PRAC. & PROC. CIV. § 2983 at 20; 65 AM. JUR. 2d *Receivers* § 10). Furthermore, with a Full Receiver in control of Up In Smoke, there is little likelihood that Up In Smoke's assets will be siphoned off through Fats, or any other enterprise created by Rudy, obviating the apparent concern that precipitated the initial appointment of a Limited Receivership over Fats.

## V. CONCLUSION

For the reasons set forth above, the Motion to Appoint a Receiver (Docket # 62) is GRANTED IN PART, in that a Full Receiver will be appointed for the control and management of Up In Smoke, but DENIED as to CR Smoke and Fats Enterprises. By the entry of a contemporaneous separate Order, the Court appoints Martin E. Seifert as the Full Receiver over Up In Smoke. David Danic is discharged as the Limited Receiver of Up In Smoke, CR Smoke, and Fats, provided, however, he shall cooperate with the Full Receiver of Up In Smoke as provided in the contemporaneous Order. To the extent the Stipulated Order (Docket # 79) establishes Charlotte as the manager of Up In Smoke and Alan D. Mikesell as Miller's representative to monitor the corporation, those appointments are hereby terminated. The pending Motion to Amend (Docket # 123) remains under advisement as any such claim now belongs to the Full Receiver.

SO ORDERED.

Enter for December 8, 2010.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge